IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-2046

_____


BANK ONE TEXAS NATIONAL ASSOCIATION,

Plaintiff-Appellee,
Cross-Appellant,

v.

GARY E. MORRISON,

Defendant-Appellant,
Cross-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

(July 7, 1994)

Before KING and WIENER, Circuit Judges, and ROSENTHAL[*], District Judge:

PER CURIAM:

Appellant Gary E. Morrison ("Morrison") appeals from a judgment rendered against him on the basis of a guaranty he executed in favor of the predecessor to appellee Bank One Texas National Association ("Bank One"). Bank One cross-appeals from the district court's refusal to award attorneys' fees. Finding that the district court erred in disregarding pertinent jury findings, we reverse its judgment and render for Morrison. In

_____

[*] District Judge of the Southern District of Texas, sitting by designation.

light of our disposition of the case, we do not reach the issue of Bank One's attorneys' fees.

## I.  Background

### A.    The Note and Guaranty

Morrison and others formed Triple M Drilling Company ("Triple M") in January of 1984.  In 1985, Triple M obtained a $200,000 line of credit from MBank Houston, N.A. ("MBank"). Morrison executed an unconditional personal guaranty in favor of MBank for that line of credit, as well as for any debt incurred after the issuance of the credit line (the "guaranty").  The guaranty expressly provided that Morrison could unilaterally cancel at any time by giving written notice and thereby limit his obligation to those sums previously borrowed by Triple M, protecting him from subsequently-incurred indebtedness.  The evidence does not reflect that Morrison ever sent such a notice to MBank.

Triple M drew upon the line of credit, but quickly repaid the loan and never again borrowed money under that line of credit.  Both Morrison, and Robert Baldwin ("Baldwin"), the MBank officer responsible for the loan, testified that the parties intended that the guaranty be cancelled upon repayment of the original $200,000 line of credit.  Baldwin stated that MBank required the guaranty as to the $200,000 line initially because Triple M was a new company and had no receivables with which MBank could secure the loan.  Once the company began generating

2

receivables, he testified, MBank released the guaranty. Bank One did not offer any evidence to refute this testimony.

Baldwin additionally stated that he informed MBank's note department that the instruments were cancelled and instructed the employees to return the cancelled documents to Morrison. Although Baldwin testified that it was his normal practice to give such instructions in writing, no such writing is in evidence. MBank did, however, return a package of loan documents to Morrison, including the original $200,000 note and a copy of the guaranty, conspicuously stamped across the first page with the word "CANCELLED."

Morrison's assistant, Carolyn Harbeson ("Harbeson"), placed these documents in Morrison's safe, believing them to be originals. When she subsequently discovered that Morrison had received only a copy of the guaranty, she requested the original from Baldwin at MBank, who assured here that the original was in MBank's "dead files" and was therefore effectively cancelled.

In February of 1986, Triple M obtained a second line of credit in the amount of $500,000. MBank's official loan documents reflect that this line was not guaranteed. For example, the loan application discloses the guarantors as "none," and states that "[a]lthough [Morrison] has a strong personal financial statement, he has no personal liability on this loan." Further, when the credit line was renewed and increased to $750,000 in August of 1986, the loan application again specifically recited that there were no guarantors and that

3

"[Morrison] does not guarantee this line; therefore [he] has no personal liability."  Numerous additional MBank memoranda and official bank documents consistently reflect that this loan was not guaranteed.

### B.    The Triple M Suit

After the March 3, 1987, stated maturity date on the $750,000 note passed, MBank declared the note to be in default and seized as an offset approximately $400,000 in Triple M's payroll account at MBank, an action which apparently forced Triple M into bankruptcy.  MBank did not, however, make demand upon Morrison to pay off the note.  Triple M filed suit against MBank in state court alleging that, in seizing the payroll account, MBank breached an agreement to extend the maturity date of the note until the end of 1987 (the "Triple M suit").  Morrison intervened in the Triple M suit seeking damages that he claimed he suffered directly as a result of MBank's misconduct in connection with Triple M's $750,000 note.

In March of 1989, MBank was declared insolvent, and the FDIC was appointed as receiver.  After its appointment, the FDIC intervened in the Triple M suit and removed it to federal court. After the Deposit Insurance Bridge Bank, N.A., n/k/a Bank One, acquired substantially all of MBank's assets (including the note and guaranty at issue) as part of a purchase and assumption transaction with the FDIC, Bank One attempted to intervene in the action and, although it originally permitted Bank One to do so, the district court changed its mind on rehearing, declining to

4

exercise any supplemental jurisdiction over that dispute, and struck the intervention.

### C.    The Instant Case

Bank One filed this lawsuit against Morrison in state court on January 21, 1991, asserting the continued validity of the guaranty and seeking to recover the balance of the $750,000 note. Morrison counterclaimed against Bank One and made certain allegations regarding MBank.  Perceiving that Morrison had stated claims against the defunct MBank, the FDIC intervened as receiver for MBank and removed the case to federal court.  The FDIC moved for, and was granted, partial summary judgment on some of Morrison's affirmative defenses.  In response to the FDIC's motion, Morrison asserted that his counter-claim was based solely upon the conduct of Bank One in filing suit against him on an alleged guaranty obligation that it knew from its own records had been cancelled, but that he did not challenge any action of MBank in the instant action.  After Morrison made clear that his surviving claims were asserted only against Bank One and not against MBank, the FDIC withdrew from the case with the consent of the parties and the court.  Upon the FDIC's dismissal, Morrison moved unsuccessfully to dismiss the case for lack of subject matter jurisdiction.

At trial, the court submitted, over objections from both parties, a jury question asking whether **Bank One** had released Morrison from the guaranty.  The jury found that Bank One did

5

not.[1]  The jury also found that the guaranty was not intended to apply to the $750,000 note.  The court, however, disregarded the jury's finding on the parties' intentions, deeming that answer to be irrelevant in the face of what it considered to be an unambiguous guaranty contract, and entered judgment in favor of Bank One.  The court also disregarded the jury's finding that $12,000 would adequately compensate Bank One for its attorneys' fees and entered a final judgment on February 11, 1993.  Morrison timely appealed the judgment notwithstanding the verdict, and Bank One cross-appealed, contesting the district court's failure to award attorneys' fees.

## II.  Analysis

### A.  Morrison's Appeal

#### 1.  Subject matter jurisdiction

Morrison first contends that the district court erred in failing to dismiss or remand the case for want of subject matter jurisdiction.  He argues that the FDIC was never made a proper party to the litigation because it had no legitimate interest in the case; consequently, no right to a federal forum ever arose, and removal was improper.  See NCNB Texas Nat'l Bank v. Fennell, 942 F.2d 934, 936 (5th Cir. 1991) (assuming that the FDIC must have a legitimate interest in the case in order to be a "proper" party); FSLIC v. Griffin, 935 F.2d 691, 696 (5th Cir. 1991) (same), cert. denied, 112 S. Ct. 1163 (1992); see also Bank One,

---

[1] Morrison contends that the jury's answer in this regard is irrelevant because the pertinent inquiry was whether **MBank** had released Morrison.

6

<u>Texas, N.A. v. Elms</u>, 764 F. Supp. 85, 89-90 (N.D. Tex. 1991) (remanding cause to state court upon determination that the FDIC had no legitimate interest).  Resolution of this contention turns on whether Morrison actually stated claims against MBank in his counter-claim.  According to Morrison, the reference to MBank in his counter-claim )) which the FDIC used as the basis of its intervention and subsequent removal )) was a mere clerical error, and the misnomer should have been apparent from the face of the pleading.

Although we share Morrison's concern that federal jurisdiction should not be manipulated by the FDIC's simple intervention in a given case, we find that, under the circumstances presented, the FDIC had a interest in the case at bar sufficient to support its intervention.  Morrison's counter-claim refers to "counter-defendant MBank, Bank One's predecessor" and asserts that "[t]he actions of MBank and Bank One constitute a fraud on Gary Morrison and an attempt to unjustly enrich themselves."  The relief sought was against "counter-defendant."  Interspersed among his defenses, Morrison challenges the guaranty as having been "executed under duress, that there was a failure of consideration and that his signature was obtained by fraud," defenses which clearly go to the actions or omissions of MBank.  The combination of allegations in the counter-claim leads us to conclude that the FDIC validly perceived that Morrison was asserting claims against the MBank receivership estate and that its intervention was proper.

7

Further, Morrison never moved to dismiss any claims against the FDIC or request a remand on the basis that federal jurisdiction was lacking )) even though it was clear that the FDIC's only purpose in intervening was to defend against claims it believed were asserted against the fallen MBank )) until after the trial court had granted partial summary judgment in favor of the FDIC.  Once the FDIC became a party to the action, the suit was deemed to arise under federal law, see 12 U.S.C. § 1819(b)(2)(A), and the FDIC had the right to remove it, 28 U.S.C. §§ 1441 and 1446.  Because jurisdiction is determined as of the time of removal and post-removal events will generally not deprive the court of jurisdiction, Asociacion Nacional de Pescadores v. Dow Quimica de Colombia, S.A., 988 F.2d 559, 565 (5th Cir. 1993), cert. denied, 114 S. Ct. 685 (1994); Griffin, 935 F.2d at 696, the FDIC's subsequent dismissal from the case did not deprive the court of subject matter jurisdiction.

Morrison contends nonetheless that the FDIC's dismissal was not a post-removal event but rather a recognition that jurisdiction never existed from the first.  See Dow Quimica, 988 F.2d at 565 (observing that federal court was examining jurisdictional facts as of the time the case was removed but considering information submitted after removal).  We disagree. First, Morrison's assertion that Bank One and the FDIC knew or should have known at the time of removal that he did not intend any claims against MBank based upon pre-receivership conduct is disingenuous in light of his prolonged delay in taking any action

8

to clarify or amend his pleading.  Morrison's response to the FDIC's motion for summary judgment did little to clarify that MBank's actions were not at issue, especially when he did not amend his counter-claim to reflect this alleged intention.  In fact, it was not until the pre-trial order stage of these proceedings that Morrison appeared to have abandoned completely and unequivocally any claims against the FDIC.  Under the facts presented, we cannot find that the FDIC's dismissal was on the basis that there was no subject matter jurisdiction as of the time of removal.  Therefore, we construe the dismissal as a post-removal event which could not have ousted subject matter jurisdiction.

## 2.  The Issue of Intent

Morrison raises a compelling argument that the court below erred in disregarding a jury finding that it was not "the mutual intent of the parties that the Morrison guaranty apply to the $750,000 Triple M Company note."  There is ample support in the record for the jury's conclusion.  Nonetheless, the district court concluded that the jury question on intent was warranted only if Morrison had pled and proved that the guaranty agreement was ambiguous.  Because it considered the guaranty to apply unambiguously to the debt at issue, the court below regarded the jury's intent finding as irrelevant and entered judgment in favor of Bank One.  We are not so persuaded.  As Morrison correctly points out, contract **interpretation** principles are irrelevant where, as here, there is a dispute over whether the guaranty was

9

even in existence as to the $750,000 note.  Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enter., 625 S.W.2d 295, 298 (Tex. 1981) ("The question of whether an agreement was reached by the parties is generally a question of fact where the existence of the agreement is disputed.").  The question of whether the parties intended the guaranty to be in effect was both clearly relevant and appropriate for jury resolution.  It went directly to Morrison's pled (and evidently proven) defense of cancellation or release.[2]  In disregarding this jury finding and refusing to submit a question asking whether **MBank** released Morrison from the guaranty (which refusal, as noted below, is also asserted as error), the district court held )) essentially as a matter of law )) that the guaranty could not have been released by MBank, primarily because Morrison never sent any written notice as required under the guaranty.  However, the provision which allows Morrison to cancel his guaranty obligation unilaterally does not render the intent question irrelevant because that clause does not speak to, or prohibit, a mutual cancellation or novation of the guaranty agreement.  E.g., Knight v. Wirotzious, 495 F.2d 543, 545 (5th Cir. 1974) (holding that a guaranty can be "waived or surrendered by the bank without regard to the means prescribed

---

[2] In the joint pre-trial order, the following issue was listed as a disputed fact:

> Whether there is a guaranty agreement between Morrison and Bank One securing Triple M's $750,000 loan agreement.

10

for cancellation by a guarantor").[3]  Therefore, a fact issue existed as to whether the parties agreed to cancel the guaranty )) or at the very least modify the contract to exclude the obligation at issue.  This issue was properly submitted to the jury in the form of the intent question.

The loan applications and supporting MBank documents show that Morrison did not guarantee the $750,000 obligation.  The indispensable, component loan documents reflect that the parties specifically agreed that the $750,000 obligation was not guaranteed, presumably because the guaranty contract was either cancelled or modified to exclude that note.  See, e.g., 3 A. CORBIN, CORBIN ON CONTRACTS § 574, at 371 (1960) ("Any contract, however made or evidenced, can be discharged or modified by subsequent agreement of the parties.").  MBank's own internal memos specifically recite that Morrison was to have no personal liability on the notes.  For example, when Triple M's financial condition began to deteriorate, Kathryn Seider ("Seider"), the MBank officer who replaced Baldwin, requested that Morrison execute a new guaranty for the $750,000 credit line.  Seider's own credit analyses which carefully discuss sources of repayment do not mention Morrison as a potential resource.  MBank's

---

[3] The district court's other possible justification for finding that the guaranty was not cancelled by MBank is similarly unpersuasive because it is clear that the original guaranty agreement need not have been returned to Morrison in order to cancel it.  A guaranty is not a negotiable instrument; rather, it is a contract, see FDIC v. Payne, 973 F.2d 403, 408 (5th Cir. 1992), which may be cancelled as any written agreement by mutual consent of the parties.

11

objective actions and inactions )) specifically, its failure to make demand upon or otherwise pursue Morrison as a guarantor though its own records estimated his net worth to exceed $4,000,000 )) further reflect an understanding that Morrison had not guaranteed the $750,000 line of credit.  Indeed, Bank One's own actions in seeking relief from the Triple M bankruptcy court by representing that Triple M's secured assets were "virtually" the only assets from which satisfaction could be made[4] support the view that the guaranty was likely unearthed after the fact from deep within the MBank "dead files" where it maintained cancelled instruments.  We thus conclude that the jury properly determined that the parties did not intend the guaranty to cover the line of credit at issue.  The trial court's disregard of this finding was in error.

### 3.    The Applicability of <u>D'Oench, Duhme</u>

Bank One asserts that the court below was precluded from asking about the parties' intent because that determination would necessarily and impermissibly cause the jury to evaluate whether there existed, in effect, an unrecorded side agreement to cancel the guaranty as prohibited by the doctrine first set forth in <u>D'Oench, Duhme & Co. v. FDIC</u>, 315 U.S. 447 (1942).

---

[4] Bank One filed a motion for relief from the automatic stay in Triple M's bankruptcy proceedings in order to seize Triple M's accounts receivable, representing to the bankruptcy court that these accounts were "virtually the only source of payment" for the $750,000 note.  On the basis of this representation, the bankruptcy court granted the relief requested and permitted Bank One to collect the collateral.

Morrison counters that the cancellation of the guaranty is not subject to D'Oench, Duhme because (i) Bank One failed to meet its burden of showing that the guaranty was in MBank's active files at the time its predecessor, the FDIC, acquired MBank's assets, and (ii) the voided guaranty could not have been acquired by the FDIC. As Morrison implicitly acknowledges, each of these arguments hinges upon some evidence in the record as to where the guaranty was found. Morrison, however, points only to the testimony of his assistant, Harbeson, to confirm its location. Harbeson's testimony as to what Baldwin at MBank told her regarding the location of the purportedly cancelled guaranty was objected to at trial as inadmissible hearsay, and we believe that Bank One was correct in labelling it as such. The testimony was clearly offered for the truth of the matter asserted, and it fails to meet any of the enumerated exceptions to the hearsay rule )) including the statement against interest exception because MBank was clearly a separate entity from Bank One. Even if we assume that the guaranty was in MBank's "active" files, however, that assumption does not require the application of D'Oench, Duhme here because other documents which undisputedly were contained in MBank's "active" files clearly reflect that the parties agreed that the guaranty did not apply to the $750,000 obligation.

The seminal case of D'Oench, Duhme has spawned a host of litigation exploring the parameters of its rule of estoppel which precludes a borrower from asserting against the FDIC defenses

based upon secret or unrecorded "agreements" that alter the terms of the obligation.  E.g., Campbell Leasing, Inc. v. FDIC, 901 F.2d 1244, 1248 (5th Cir. 1990).  The doctrine has been interpreted expansively to shield the FDIC from claims and defenses based upon collateral agreements not firmly established in the official records of the failed institution.  Resolution Trust Corp. v. Oaks Apartments Joint Venture, 966 F.2d 995, 999 (5th Cir. 1992).  However, "[t]he doctrine . . . has not been read to mean that there can be no defenses at all to attempts by the FDIC to collect on promissory notes. . . .  Rather, [i]t only bars those defenses which [the] FDIC could not have been put on notice by reviewing records on file with the bank."  FDIC v. Waggoner, 999 F.2d 826, 828 (5th Cir. 1993) (quoting FDIC v. Laquarta, 939 F.2d 1231, 1237 (5th Cir. 1991), and RTC v. Sharif-Munir-Davidson Dev. Corp., 992 F.2d 1398, 1404 (5th Cir. 1993)) (internal quotations omitted).

The D'Oench, Duhme rule has been partially codified at 12 U.S.C. § 1823(e), and the federal "courts generally give similar interpretations to § 1823(e) and the doctrine of D'Oench, Duhme." Laquarta, 939 F.2d at 1238.  Therefore, § 1823(e) is viewed as supplementing, not replacing, the D'Oench, Duhme doctrine.  FDIC v. Castle, 781 F.2d 1101, 1106-08 n.3 (5th Cir. 1981).  Section 1823(e) requires that the agreement sought to be enforced be:

> (1)  in writing;
>
> (2)  executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the

14

> acquisition of the asset by the depository institution;
>
> (3) approved by the board of directors of the depository institution or its loan committee, and the approval reflected in the minutes of the board or committee; and
>
> (4) an official record of the depository institution continuously from the time of its execution.

12 U.S.C. § 1823(e).

Morrison argues that the stringent requirements of § 1823(e) need not be met in the case presented because he is not relying upon any unwritten side agreement; rather, he is attempting to enforce the parties' agreement as reflected clearly in the loan documents. Alternatively, he contends that the loan documents read together as a whole constitute a written agreement between the parties which satisfies § 1823(e). As Morrison properly points out, neither D'Oench, Duhme nor § 1823(e) requires that the agreement between the parties be confined to one document; rather, a collection of official bank documents can reflect the agreement reached. Sharif-Munir-Davidson, 992 F.2d at 1405 n.13 (observing that Texas law permits a contract to "consist of multiple writings, all of which are integral to the agreement"); Oaks Apartments, 966 F.2d at 999 ("The fact that an agreement between the failed lender and the borrower is manifested in more than one document does not automatically imply a deceptive secret agreement."); Laquarta, 939 F.2d at 1238-39 (holding that the loan documents that are integral to a given transaction are to be read together). With respect to the first § 1823(e) requirement, it is undisputed that the loan documents are all in writing. The

15

second prong of the inquiry is also met because (i) Baldwin, the MBank senior vice president handling the transactions, signed the loan applications, (ii) Morrison signed the promissory notes that were the result of, and in accordance with, the loan applications, and (iii) Baldwin tied the two sets of documents together by testifying that the loan applications he signed were the same ones which were eventually approved by the loan committee and which formed the basis of the $500,000 and subsequent $750,000 credit extensions.

With respect to the third requirement, Bank One pointed out at trial that the loan applications upon which Morrison relies are incomplete because there are no written indicia of committee approval. This court, however, has previously held that board approval can be established by testimony regarding the board's "custom and routine practice." Park Club, Inc. v. RTC, 967 F.2d 1053, 1057 (5th Cir. 1992). Baldwin testified that it was the "custom and routine practice" of MBank to obtain loan committee approval prior to the extension of credit under the circumstances presented. Baldwin was certain that the transaction would not have been effected in the manner it was absent both a completed application in the form of the one introduced at trial and committee approval. As noted above, he testified unequivocally that the loan applications in evidence )) which clearly reflect no guarantors )) were the ones upon which the loan was made and that the credit was extended without any guaranty.[5] Furthermore,

---

[5] In this regard, the trial transcript of Baldwin's

the record contains other, committee-approved applications which resulted in letters of credit cross-collateralized with the loan at issue, and these applications again reflect that there were no guarantors. All of this evidence supports the view that the $750,000 loan at issue obtained the requisite approval, and Bank One did not offer **any** countervailing evidence. Cf. Park Club, 967 F.2d at 1057 (finding an issue of fact as to board approval where there was a dispute as to the normal procedures of the board and as to whether those procedures were followed). Consequently, the loan documents satisfy the third precondition.

Finally, with respect to the fourth § 1823(e) factor, the evidence at trial was uncontroverted that these loan documents were continuously in the official MBank financial records since their inception. Accordingly, under the particular facts presented, D'Oench, Duhme and § 1823(e) do not eliminate Morrison's defense that he did not guarantee the obligation at issue.

------------------------

testimony reads as follows:

> Q: So, if the loan was funded without [the guaranty], it had to be funded as set out on the face of the application, wouldn't it?
>
> A: That's correct.
>
> Q: And the face of the application contains what reference to guaranties. . . . That there are none?
>
> A: That's correct.

17

Moreover, and more fundamentally, in cases such as the one at bar where the parties' understanding is unequivocally embodied in the loan documents, "`[n]one of the policies that favor the invocation of [§ 1823(e)] are present . . . because the terms of the agreement that tend to diminish the rights of the FDIC appear in writing on the face of the agreement that the FDIC seeks to enforce.'"  Laguarta, 939 F.2d at 1239 (quoting Riverside Park Realty Co. v. FDIC, 465 F. Supp. 305, 312-13 (M.D. Tenn. 1978)). Time and time again, we have stated that the purpose of the D'Oench, Duhme doctrine is to safeguard the reliance of federal regulators upon the records of the financial institution, to the exclusion of any extraneous matters, so that they may evaluate accurately the assets and liabilities of the institution. Langley v. FDIC, 484 U.S. 86, 91-92 (1987); see also Griffin, 935 F.2d at 697.  Essentially, because the regulators must perform their analyses of an institution both quickly and accurately, the allowance of defenses or claims against a facially unqualified obligation based upon facts outside the document would eviscerate the federal policy underlying the doctrine.  Langley, 484 U.S. at 91-92; Bowen v. FDIC, 915 F.2d 1013, 1016 (5th Cir. 1990).  That purpose is not served here where all of the memoranda and supporting loan documents consistently reflect that the $500,000 and superseding $750,000 obligations were not guaranteed.  E.g., Waggoner, 999 F.2d at 828 (holding that D'Oench, Duhme did not preclude borrower's reliance upon superseded notes clearly reflecting that his liability was non-recourse in defending

18

against new note into which the superseded notes were "rolled over" and consolidated which failed to reflect that liability limitation).

Accordingly, under the circumstances of this case, we hold that D'Oench, Duhme and § 1823(e) did not preclude the trial court from asking the jury to consider whether the parties intended that the $750,000 note be guaranteed by Morrison. The integrated loan documents which evidence the parties' agreement as to the $750,000 obligation satisfy the notoriety requirements of D'Oench, Duhme and § 1823(e), resulting in a fact issue as to whether the parties intended the guaranty to apply. The jury's answer in the negative, which, as discussed above, is supported by the record, should therefore be upheld, and the district court erred in disregarding it.

### 4. Other Defenses: Res Judicata, Judicial Estoppel, and Release

Morrison proffers additional bases for reversing the district court's order, including res judicata, judicial estoppel, and an allegedly erroneous jury instruction asking whether **Bank One** )) rather than MBank )) released him from the guaranty. We need not evaluate these issues because of our disposition of the case on the basis of the jury question which was properly asked and answered. See supra at section II.A.2.

### B. Bank One's Cross-Appeal

Because we find that the guaranty was not in effect as to the $750,000 note at issue and render judgment in favor of Morrison on that point, we have effectively negated the existence

19

of the very agreement upon which Bank One depends to receive its attorneys' fees; accordingly, we decline to modify the district court's ruling preventing Bank One from receiving its fees.

### III. Conclusion

For the foregoing reasons, we REVERSE the judgment of the district court and RENDER judgment in favor of Morrison.