UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 95-20500
_____

FIRST GIBRALTAR BANK, FSB,

Plaintiff-Appellee,

FEDERAL DEPOSIT INSURANCE CORPORATION,
AS RECEIVER FOR GIBRALTAR SAVINGS ASSOCIATION,

Intervenor- Plaintiff,
Appellee,Cross-
Appellant,

versus

GARY L. BRADLEY AND JAMES D. GRESSETT AND
CIRCLE C DEVELOPMENT CORPORATION,

Defendants,
Intervenor Defendants,
Appellants,Cross-
Appellees.

_____

Appeal from the United States District Court
for the Southern District of Texas
(CA-H-93-2558)
_____
September 10, 1996
Before JONES, SMITH, and STEWART, Circuit Judges.

EDITH H. JONES, Circuit Judge:[*]

Gary L. Bradley ("Bradley"), James D. Gressett

_____

[*] Pursuant to Local Rule 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

("Gressett"), and Circle C Development Corporation ("Circle C") appeal the district court's summary judgment in favor of First Gibraltar Bank ("FGB"), on FGB's suit to recover over $80 million on four promissory notes that Circle C executed in favor of Gibraltar Savings Association ("Gibraltar"), and to recover from Bradley and Gressett on their personal guarantees of those four notes as well as on their separate, personal note for $15 million. After reviewing the district court's judgment de novo, this court AFFIRMS.

**FACTUAL BACKGROUND**

This saga began in 1985 when Circle C, Bradley, and Gressett entered into a series of loan agreements with Gibraltar for the development of Circle C Ranch, a master planned community located southwest of Austin, Texas. Gibraltar advanced nearly $80 million to Circle C on four loans (the "Project Notes"): the Land Note, Amenities Note, Phase I Development Note, and Phase II Development Note. Bradley and Gressett individually guaranteed 20% of Circle C's notes and were the borrowers under a fifth, unsecured personal loan of $15 million ("Personal Note").

The terms of the Personal Note required Bradley and Gressett to make quarterly interest payments beginning in September of 1985. Importantly, the Personal Note, though unsecured, and the Project Notes contained cross-default provisions by which a default under either the Personal Note or any of the Project Notes operated

2

as a default under all of the notes.

In May 1988, Bradley and Gressett defaulted on the Personal Note when they failed to make a quarterly interest payment. The next month, Gibraltar declared a default on the Personal Note because they had failed to cure their delinquency. Gibraltar accelerated the balance of the Personal Note and declared it, with all accrued but unpaid interest, payable immediately.

In an effort to ameliorate the financial strain caused by the default, Bradley and Gressett sold a 50% interest in Circle C for over $1 million in cash and promissory notes totaling nearly $30.5 million. Circle C was then restructured by transferring all of its interests in the Circle C Ranch to the Circle C Development Joint Venture ("Joint Venture").

Besides these measures, Bradley and Gressett also negotiated a work-out agreement with Gibraltar, titled a Reinstatement Agreement and First Loan Modification ("Work-out Agreement").[1] Pursuant to this agreement, executed November 3, 1988, Gibraltar rescinded the acceleration of the notes, while Bradley and Gressett reaffirmed their obligations under the Personal Note.

The Work-out Agreement proved unsuccessful. On December 1, 1988, less than one month after the work-out had been reached, Bradley and Gressett again defaulted on the Personal Note when they

_____

[1]    The effective date of the Work-out Agreement was September 1, 1988.

3

failed to make another quarterly interest payment. Threatened under the notes' cross-default provision, Bradley and Gressett continued to seek nearly $20 million in additional funding for their ranch project.

However, on December 27, 1988, the Federal Home Loan Bank Board ("FHLBB") declared Gibraltar insolvent and appointed the FSLIC as receiver.[2] Furthermore, the FHLBB determined that Gibraltar had insufficient assets to satisfy its secured and deposit liabilities, so that no assets were available to pay the claims of general, unsecured creditors. As a result, on December 28, 1988, the FSLIC sold and endorsed many of Gibraltar's assets, including all of the Bradley-Gressett and Circle C Notes and guarantees to FGB, the successor bank.[3] Under the acquisition agreement with FGB, the receiver retained virtually all of the unsecured liabilities of Gibraltar, including any obligation to fund further the ranch project.

After FGB acquired the relevant notes, Bradley, Gressett, and Circle C repeatedly sought additional funding from FGB. FGB denied any obligation to make such advances, but it chose to fund

---

[2]     Under the Financial Institutions Reform, Recovery, and Enforcement Act, the FDIC succeeded FSLIC as receiver.

[3]     The transaction is actually more complicated, but has been simplified for the sake of clarity. First Texas Bank, FSB is the entity that originally acquired the notes from the FSLIC. It later changed its name to First Gibraltar Savings Association, FSB ("FGB"). FGB later changed its name to First Madison Bank, FSB, and is now known as First Nationwide Bank, FSB. As will be discussed, FGB initially filed the instant suit, so for clarity and simplicity, the appellee will be referred to as FGB in this appeal.

the ranch project only to preserve the value of the collateral; the funds, however, were advanced only after Bradley, Gressett, and Circle C acknowledged that the advances were not a ratification or assumption of Gibraltar's obligations by FGB. During the first six months of 1989, FGB advanced over $5 million to the ranch project in an attempt to preserve its collateral.

Continued funding came to a screeching halt when FGB received the results of an appraisal of the project in mid-1989: according to the appraisal, over $80 million in debt was secured by less than $29 million in collateral. Faced with this deficiency, FGB refused to advance any more funds to the project unless Bradley, Gressett, and Circle C executed letter agreements confirming that they had no claims against FGB and waiving any potential claims. During the year from September 1989 to September 1990, approximately 27 such letter agreements were executed.

Without long-term financing, the Circle C Ranch Development could not survive, and the defendants were unable to satisfy their financial obligations to FGB. FGB filed suit in Texas state court in September 1990 seeking recovery under the interlocking agreements. The defendants answered and asserted various counterclaims against FGB, including fraud, breach of contract, breach of fiduciary duty, and tortious interference with contract. The defendants also contended that Gibraltar's insolvency and the appointment of the FSLIC as receiver for the failed bank amounted to a repudiation of the debt. Further, the

defendants argued that FGB assumed Gibraltar's funding obligations when it received Gibraltar's assets from the FSLIC.

Nearly three months after the lawsuit was filed in state court, the Joint Venture filed for relief in bankruptcy. After a reorganization plan was confirmed, the Joint Venture executed a release of its claims against Gibraltar, FGB, the FSLIC, and the FDIC.

While the litigation was pending in state court, FGB twice filed motions for summary judgment. The state court denied summary judgment, reasoning that a number of fact issues existed, including whether FGB was actually the holder and owner of the notes and individual guarantees of the defendants. The FDIC intervened in the state action on August 18, 1993, asserting that such intervention was required to protect any interest of the FDIC that might be implicated by the litigation.[4] The FDIC exercised its statutory right to remove the case to federal court under 12 U.S.C. § 1819.

In federal district court, the FDIC and FGB each sought summary judgment. The defendants moved to strike the FDIC's intervention and to remand the action to state court. The district court granted summary judgment to FGB, and, as part of that judgment, denied the motion to remand but dismissed the FDIC as a

---

[4] Principally, the FDIC suggests that it had an interest in securing a declaration from the court that it had authority, as receiver, to assign Gibraltar's assets to FGB unencumbered by Gibraltar's unsecured liabilities.

6

party to the action. The defendants timely appealed, and the FDIC has cross-appealed its dismissal from the case.

**DISCUSSION**

## I.    Removal Jurisdiction and FDIC's Intervention

The defendants contend that the district court erred when it denied their motion to strike the FDIC's intervention and to remand the action to state court. Specifically, the defendants argue at length that because the FDIC had no interest in the lawsuit and was never a proper party to the proceedings, a remand to state court was required. FDIC argues that the district court's decision to dismiss it from the litigation was erroneous. This court reviews for abuse of discretion the district court's denial of the motion to strike the FDIC's intervention. *See, e.g., Nutro Products Corp. v. NCNB Texas Nat'l Bank,* 35 F.3d 1021, 1023 (5th Cir. 1994). Legal issues concerning the existence of federal removal jurisdiction are reviewed de novo by this court. *See, e.g., Halferty v. Pulse Drug Co.,* 864 F.2d 1185, 1188 (5th Cir. 1989). Because the parties' contentions are interrelated, we will discuss them together.

Defendants' argument is difficult to follow, but they seem to assert that FDIC was never a proper party to the case in state or federal court, and that FDIC intervened "collusively" in state court solely to assist FGB by removing the case to federal court. FDIC responds to these assertions and to the district

7

court's order of dismissal with these propositions: (1) the FDIC has an interest in this litigation that entitles it to intervene because the state court sought to adjudicate whether the FDIC had assigned the notes and guarantees to FGB unencumbered by continuing funding obligations; (2) the defendants asserted claims against Gibraltar, and the FDIC is entitled to intervene when claims are brought against a failed bank for which it was appointed receiver; and (3) the FDIC satisfied the criteria for intervention under Fed. R. Civ. P. 24 because it had agreed to indemnify FGB, the acquiring bank.

There is no dispute that when the FDIC originally intervened in the state court litigation, it did so pursuant to Tex. R. Civ. P. 60, which allows any party to intervene in the proceedings merely by filing pleadings.[5] FDIC was thus a proper party to the case in state court. What provoked FDIC's intervention was the state court's cryptic ruling denying FGB's summary judgment motion and finding certain fact issues, including "whether FGB is the holder and owner of the notes . . . ." The state court also held "that fact issues exist whether the FDIC or [FGB] is owner and holder of the notes and guarantees of the defendants . . . ." These statements appeared to set for trial the

_____

[5]     Tex. R. Civ. P. 60 provides that "[a]ny party may intervene by filing a pleading, subject to being stricken out by the court for sufficient cause on the motion of any party." The intervening party may, however, be dismissed for sufficient cause on the motion of any other party to the litigation. During oral argument, the defendants conceded that the FDIC's intervention under Rule 60 was proper.

issue whether the FDIC still owned the assets,[6] an issue sufficient to warrant the agency's intervention.[7]  The defendants' arguments to the contrary are specious.

FDIC contends that its interest in the litigation also arose from the counterclaims alleged by the defendants.  Indeed, to the extent that the counterclaims attack the actions of Gibraltar, they challenge FDIC's interests, if for no other reason than that the agency assumed those liabilities when it purchased Gibraltar's assets.[8]  More to the point, the assistance agreement between the

The more interesting question is whether FDIC remained a real party in interest in the federal court case, or whether the district court properly dismissed it.

---

[6]     The FDIC argues that the language of the state court opinion drew into question the very authority granted the FDIC by Congress to dispose of receivership assets when federally insured financial institutions fail.

[7]     Despite the state court's language intimating the contrary, there is no doubt that the FDIC has statutory authority to sell and dispose of receivership assets.  The statute expressly provides that the FDIC may, for example, "take over the assets . . . and conduct all business of the institution," "collect all obligations and money due the institution," and "preserve and conserve the assets and property of such institution."  12 U.S.C. § 1821(d)(2)(B)(i), (ii), and (iv).  The FDIC may also "place the insured depository institution in liquidation and proceed to realize upon the assets of the institution . . . ," including the "transfer [of] any asset or liability ofthe institution in default . . . ."  12 U.S.C. § 1821(d)(2)(E), (G)(i)(II).  Given this unambiguous statutory language, this court has repeatedly recognized that the FDIC's enumerated powers as receiver are both extensive and discretionary, free from court-imposed restraints.  *See, e.g., Ward v. RTC,* 996 F.2d 99, 103-04 (5th Cir. 1993); *281-300 Joint Venture v. Onion,* 938 F.2d 35, 39 (5th Cir. 1991), *cert. denied,* 502 U.S. 1057, 112 S. Ct. 933 (1992); *see also,* 12 U.S.C. § 1821(j)(providing that "no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver").

[8]     Because the FHLBB issued a worthlessness finding declaring Gibraltar Savings insolvent and appointing the FDIC as receiver, any claims against Gibraltar would be valid, if at all, against the receiver alone.  *See, e.g.,*

9

FDIC and FGB guaranteed a rate of return on the book value of the loans backed by the federal government; any risk of not ultimately collecting the book value of the loan rested solely with the FDIC, not FGB. Given the agency's obligation to indemnify FGB, the acquiring bank, FDIC had a concrete financial interest in the litigation that would justify its status as a party.[9]

This court has recognized as much, holding that the FDIC is a proper party in lawsuits raising allegations against a failed bank, even when the FDIC's statutory authority to transfer the failed bank's assets is not questioned and when the asset has been assigned to a successor bank under a purchase agreement. Hence, the FDIC is entitled to intervene in a lawsuit when claims are made against a failed institution for which the FDIC acted as receiver.

---

*First Indiana Bank, FSB v. FDIC,* 964 F.2d 503, 507 (5th Cir. 1992).

[9] In *Pernie Bailey Drilling Co. v. FDIC,* 905 F.2d 78, 80 (5th Cir. 1990), this court dismissed

> Pernie Bailey's assertion that FDIC is not a party to the case. *The designation of FDIC as a proper party stems in part from its obligation to indemnify NCNB under the terms of the [Purchase and Assumption] Agreement.* After assignment, NCNB became the proper party to sue on the notes, but even so, FDIC is entitled to defend a claim of recission. Although the notes were assigned before removal, the FDIC remained the proper party to defend all claims for damages against the closed bank.

The defendants read *Pernie Bailey* very narrowly and urge that it merely found the indemnification agreement relevant to the FDIC's right to intervene and did not hold that such an agreement, standing alone, would consistently warrant intervention. But this court need not address whether such an indemnification agreement would always justify FDIC intervention and concludes only that, under the facts of this case, the indemnification agreement supports the conclusion that the FDIC was entitled to participate in this litigation.

*See, e.g., Bank One Texas Nat'l Ass'n v. Morrison,* 26 F.3d 544, 547 (5th Cir. 1994) (whether the FDIC was a proper party "turns on whether Morrison actually stated claims against [the failed bank] in his counter-claim"); *FSLIC v. Griffin,* 935 F.2d 691, 696 (5th Cir. 1991) (FDIC had a right to defend claims against a failed bank where a party asserted four counterclaims against the FDIC as receiver for the failed bank); *Pernie Bailey,* 905 F.2d 78, 80 (5th Cir. 1990) (recognizing that "the FDIC remained the proper party to defend all claims for damages against the closed bank"); *Beighley v. FDIC,* 868 F.2d 776, 779-80 (5th Cir. 1989) (explaining that the FDIC is the proper party to defend claims against the failed bank even after the bank's assets have been assigned).

But the defendants insist that the above authorities are not persuasive because they do not assert any affirmative claim for relief against Gibraltar, the FSLIC, or the FDIC. This attempt to distinguish the caselaw is both misleading and unavailing. In their Fifth Amended Answer and Sixth Amended Counterclaim filed in state court and reasserted in federal district court, the defendants do describe and allege various acts and omissions of Gibraltar. For instance, the defendants assert that their obligations under the loan agreements and guarantees are somehow excused as a result of

> Gibraltar Savings Association's (the Plaintiffs' predecessor-in-interest) prior material breaches of the contracts at issue. Gibraltar . . . was closed and was unable to

11

> fulfill its funding obligations under the loan agreements. This failure constitutes a material breach of the loan agreements and preceded any alleged failure of the Defendants to fulfill their obligations under the loan agreements.

The defendants allege further that Gibraltar and the FSLIC either negligently or intentionally prevented their performance of their loan obligations; they contend that

> [i]n order for the Defendants to be able to meet their obligations under the various loan agreements at issue in this case, the Plaintiff and/or Gibraltar Savings, and/or the FSLIC were obligated to fulfill their obligations under these same loan agreements. They did not do so. As a result, Circle C Ranch was not able to generate the expected profits that all parties realized would be the source of funds used to pay off the indebtedness at issue. Accordingly, the Defendants' ability to perform under these loan agreements was rendered impossible.

(emphasis in original). The allegations against Gibraltar continue, as the defendants suggest that they are excused from performance under the loan agreements "by the breach of Gibraltar Savings of its duty of good faith and fair dealing owed to the Defendants." The plain language of the pleadings filed by the defendants in state court and reasserted in federal district court belies their assertion that this lawsuit does not implicate Gibraltar or the FDIC.

Further, in *Morrison,* this court explained that the FDIC can intervene even when the defendant does not assert any counterclaims against the failed bank. *Morrison,* 26 F.3d at 547-

12

48. FDIC intervention is appropriate when, as here, the defendants assert defenses or claims which reference or rely on the actions of the failed bank or its receiver.  In *Morrison,* intervention was appropriate because

> [i]nterspersed among his defenses, Morrison challenges the guaranty as having 'been executed under duress, that there was a failure of consideration and that his signature was obtained by fraud,' defenses which clearly go to the actions of [the insolvent] Mbank.  The combination of allegations in the counter-claim leads us to conclude that the FDIC validly perceived that Morrison was asserting claims against the Mbank receivership estate and that its intervention was proper.

*Id.* at 547.  In the present case, the FDIC reasonably reached a similar conclusion from the language of the defendants' answer and counterclaims.[10]

As in *Morrison*, the FDIC was entitled to be a party in this case, the case was properly removed, and the district court did not abuse its discretion when it denied the defendants' motion to strike FDIC.  Also, because federal jurisdiction is assessed at the time of removal, the district court's ultimate dismissal of the FDIC did not affect the court's subject matter jurisdiction. *See, e.g., id.*  The disposition of FDIC's appeal to this court adds one last wrinkle to the parties' procedural arguments.  Not that this question matters much, but the parties may think it anomalous that

_____

[10]     Because there are other grounds on which to conclude that the FDIC was entitled to intervene in this case, the court need not discuss whether the FDIC also satisfied the criteria for intervention under Fed. R. Civ. P. 24(a)(2).

13

after defending FDIC's status as a party in state court and for removal purposes, we will nevertheless affirm its dismissal by the district court. We do this not because the agency's participation was "unnecessary," however, but because, after the district court decided to grant summary judgment for FGB, any threat to FDIC's interests terminated. At that point, FDIC could have followed the route it did in *Morrison*, *supra*, by withdrawing from the case. The district court did not afford FDIC that option, but FDIC has not sought "reversal" of the dismissal on appeal, instead praying for affirmance of the judgment for FGB. In sum, we may affirm FDIC's dismissal even while disagreeing with the district court's reason for it.

## II. Standing[11]

The district court held that the borrowers lacked standing to raise any claims against FGB. The court also found that Bradley and Gressett, as shareholders and principals of Circle C, could not assert personal claims for wrongs done to the corporation. Moreover, the district court ruled that Circle C had assigned all of its claims to the Joint Venture, which had in turn released FGB as part of its bankruptcy reorganization.

While the district court was correct that Bradley and

---

[11] Our discussion here is limited only to the issue of standing; whether the defendants have waived claims which they would otherwise have standing to raise will be discussed separately.

Gressett do not have standing as shareholders and principals,[12] they do have standing as guarantors of the loans to assert the defenses that would have been available to the borrowers. *See, e.g., Mayfield v. Hicks,* 575 S.W.2d 571, 574 (Tex. App.--Dallas 1978, writ ref'd n.r.e.) (recognizing that in Texas the general rule is that "guarantors have the right to raise any defenses to the guaranteed obligation that the principal may have."); *Stephens v. First Bank & Trust of Richardson,* 540 S.W.2d 572 (Tex. App.--Waco 1976, writ ref'd n.r.e.).

Circle C, by contrast, does not have standing to assert any claims against FGB. Circle C assigned all of its rights under the loan agreements to the Joint Venture. The language of the assignment was sweeping and divested Circle C of all its interests and rights, transferring these to the Joint Venture.[13] For instance, when the Joint Venture accepted the assigned assets, it did so pursuant to a clause stating

> subject to all the liabilities and obligations
> incurred in connection with the Assets as they

---

[12] *See, e.g., Wingate v. Hajdik,* 795 S.W.2d 717, 719 (Tex. 1990) (holding that "[a] corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong").

[13] The defendants urge that even though the Joint Venture owns all of Circle C's interest in the loans and project, the Joint Venture would somehow not own Circle C's claims for fraudulent inducement or for violations of the other duties alleged by the defendants. The defendants cite no authority for this proposition and it is contradicted by the sweeping language of the assignment agreement. While Circle C could have expressly provided in the assignment agreement that the right to assert its claims for these alleged violations was retained by Circle C rather than assigned to the Joint Venture, no such provision is found in the agreement.

15

> exist on the date hereof, whether fixed, contingent, known or unknown, including, but not limited to, the satisfaction of any judgment, order, or decree which may be entered against [Circle C] in any pending suit as a result of such liabilities and obligations. Nothing contained in this Assignment shall, or shall be construed to, prejudice the right of [the Joint Venture] to contest any claim or demand *as fully as [Circle C] might have done [before the Assignment]*.

(emphasis added). Moreover, as was previously discussed, the Joint Venture later filed for bankruptcy and released its claims against FGB as part of its plan for reorganization. As a result, the district court correctly observed that Circle C lost standing to raise claims against FGB when it assigned its entire interest in the loan agreements and project to the Joint Venture; if the Joint Venture could have asserted any claims against FGB prior to bankruptcy, those claims now belong to the bankruptcy estate and have been released.[14]

## III. Waiver

Because only Bradley and Gressett have standing as guarantors of the loans to assert the defenses that would have been available to the borrowers, this court must now consider whether Bradley and Gressett have waived their rights to assert such defenses.

---

[14] The defendants counter that Circle C explicitly reserved its right in the bankruptcy release to assert certain claims. This argument is not meaningful, however, because Circle C no longer has standing to raise any affirmative claims against FGB.

16

The district court found that Bradley and Gressett had repeatedly waived the defenses and counterclaims that they attempted to assert. Specifically, the court found that Bradley and Gressett waived these claims against Gibraltar in both the Work-out Agreement and a Fourth Loan Modification, executed on November 3, 1988. Further, the court found that Bradley and Gressett had waived their claims and defenses against FGB in at least 27 letter agreements that FGB required them to execute before it advanced funds to preserve the value of the collateral.

The defendants disagree, contending that they have specifically reserved their rights to raise the instant claims and defenses. At oral argument, the defendants were willing to concede only that they waived all claims and defenses prior to November 3, 1988.

The defendants' contention is only partially correct. There is no doubt that the defendants waived all claims and defenses prior to November 3, 1988. The Work-out Agreement expressly provides in § 11.3 that Bradley and Gressett waive "any and all such offsets, claims, defenses or counterclaims" of "any nature whatsoever . . . to any of the terms, conditions or provisions" of their Personal Note and loan agreement. Additionally, in connection with the fourth loan modification, Bradley and Gressett executed a guarantor's ratification agreement in which they

represent[ed] and warrant[ed] to Lender that

17

> as of the date of this Guarantor's Ratification there exists no offset, claim, defense or counterclaim of any nature whatsoever to any of the terms, conditions of provisions of the Guaranty and . . . to the extent such offsets, claims, defenses or counterclaims do exist, Guarantor hereby expressly and knowingly waives any and all such offsets, claims, defenses or counterclaims.

This language speaks for itself.

When FGB purchased Gibraltar's assets from the FDIC, it refused to advance funds to the defendants to preserve the value of the collateral unless the defendants executed a letter agreement acknowledging that FGB did not have a continuing obligation to fund the project; 27 such letter agreements were executed between September 27, 1989 and September 25, 1990. The agreements provided that "FGB has not assumed any responsibility or liability for performance of the obligations of [Gibraltar] under the Loan Documents *including, without limitation, the obligations of the Closed Association to fund the loan described in the Loan Documents.*"[15] The letter agreements also state that

---

[15] *See* Letter from FGB to Defendants, dated September 25, 1989, and signed by the defendants on September 27, 1989 (emphasis added) at 2. The relevant provisions in the remaining 26 letters are virtually identical.

Indeed, any suggestion that FGB had a continuing obligation to fund the project is frivolous; the agreement provides that

> (I) no such action shall be deemed or construed, whether by operation of law, the principles of equity or otherwise, as an assumption by or agreement of [FGB], or a course of dealing which obligates [FGB], to keep, perform, or observe the responsibilities, obligations and covenants, express or implied of [Gibraltar] under the Loan Documents, (ii) [FGB] has no such obligation to the Borrower, the Guarantors or any other party in respect to the Loan Documents, (iii) neither the Borrower nor such Guarantors will assert as a result of

> the Borrower and the . . . *Guarantors each waives and releases any and all offsets, claims, defenses, or counterclaims of any nature whatsoever which any of them has or may have against [FGB],* provided, however, that the Borrower and the undersigned Guarantors *reserve any defense or offset* (but not any other claims or rights) with respect to the enforceability of the Loan Documents now held by [FGB] *arising from the acts or omissions of the Closed Association or of the FSLIC, acting in its capacity as receiver of the Closed Association, or any successor of the FSLIC acting in that same capacity* (acknowledging, without prejudice, that [FGB] denies both the existence of all such defenses or offsets and the applicability thereof to the enforceability of the Loan Documents in the hands of [FGB], and [FGB] expressly reserves all rights to deny, challenge and defend against any such defense or offset . . . .

*Id.* at 3 (emphasis added). Under these provisions, Bradley and Gressett waived their claims against FGB and reserved only those defenses or offsets arising from the acts of Gibraltar, the FSLIC, or the FDIC. However, as FGB correctly argues, given the fact that Bradley and Gressett waived their claims against FGB and that they expressly and unequivocally acknowledge that FGB has no obligation to them to fund the project, the rights reserved by Bradley and

---

> the execution of the partial release(s) described in this letter or the negotiations and conversations between [FGB], the Borrower and such Guarantors in respect thereto, whether at law or in equity, that [FGB] has assumed such obligations or is otherwise responsible in any manner for the performance of the obligations, covenants and agreements of the Closed Association described in the Loan Documents including, without limitation, the commitment to loan funds as described in said instruments . . . .

*Id.* at 2-3.

19

Gressett against Gibraltar, the FSLIC, or the FDIC would be meaningful only in a lawsuit against those entities; these rights are irrelevant in the instant case.

Careful review of the record thus demonstrates that Bradley and Gressett waived not only all of their claims prior to November 3, 1988, but also their claims against FGB; hence, Bradley and Gressett have waived all of their claims except during the period from November 4, 1988 to December 28, 1988, the date that FGB acquired Gibraltar's assets.

Recognizing that the letter agreements otherwise destroy the viability of their claims against FGB, the defendants suggest that these agreements are somehow the product of "economic duress." They contend that they were in a "dire situation" and that "[t]hey were therefore, out of fear of economic loss, forced to accept whatever FGB would give them, on whatever terms FGB required." This argument is unsupported by either the law or the record. In *Lee v. Wal-Mart Stores, Inc.,* 943 F.2d 554, 560 n.11 (5th Cir. 1991), this court explained that

> [t]he test for [economic] duress [under Texas law] includes the following factors: (1) there can be no duress unless there is a threat to do some act which the party threatening has no legal right to do; (2) there must be some illegal exaction or some fraud or deception; (3) the restraint must be imminent and such as to destroy free agency without present means of protection. Further, economic duress can be claimed only when the party against whom it is claimed was responsible for a claimant's financial distress.

(citations omitted); *see also, Callum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89 (5th Cir. 1995). FGB had a legal right to condition any further funding to preserve the project's capital on execution of the letter agreements. Defendants offered no evidence that FGB exacted these agreements through fraud or deception or that the defendants were otherwise forced or coerced into executing the agreements twenty-seven times. Finally, the defendants' financial woes began long before they executed any agreement with FGB; FGB was not responsible for the defendants' financial distress.

Because the defendants have waived all of their claims against FGB, this court need not address the merits of the various claims for breach of the lending agreements, breach of fiduciary duty, fraud, estoppel, etc.

### CONCLUSION

For the foregoing reasons, the judgment of the district court granting summary judgment in favor of FGB and dismissing the FDIC as a party, is **AFFIRMED.**

21